**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA |
| |
| v. |
| |
| DENNIS T. BUTLER, |
|        Petitioner/Defendant |

Criminal No. 70-cr-1717 (BAH)

Chief Judge Beryl A. Howell

## MEMORANDUM OPINION

Forty seven years ago, on the evening of September 29, 1970, Jesse Mears was brutally murdered. His body was found lying on the bathroom floor of a vacant apartment in the building in which he worked, with his hands bound behind his back, a wet stocking stuffed in his mouth, and a telephone wire wrapped around his neck. Paint was found on his clothing and on a bottle of water found next to him, and his keys and wallet were missing. He appeared to have struggled before he died. By the next day, the police had arrested the defendant, Dennis Butler, whom testimony placed near the building the day of the murder accompanied by the victim. Later that day, two of the defendant's associates, to whom he sometimes supplied heroin, provided generally consistent statements to the police that, shortly after the murder, the defendant had confessed he had done it. At trial, the prosecution presented an array of evidence linking the defendant to the crime, including testimony from witnesses who saw the defendant and victim on the day of the murder and from the defendant's two associates recounting the details of the confession the defendant made to them. Expert testimony was also presented by two Federal Bureau of Investigations ("FBI") agents that paint residue on the victim, items at the crime scene and on the defendant's clothing appeared to be from the same source, as well as that three hairs found on the victim's clothing "matched" characteristics of hairs from the defendant. The jury

found the defendant guilty of felony murder, murder in the first degree, and robbery, for which convictions the defendant was sentenced, in 1972, to two terms of 20 years to life imprisonment on the first-degree murder and felony murder counts, and 5 to 15 years in prison for the robbery count, to be served concurrently.

Following review of the defendant's case by the Department of Justice ("DOJ") and the FBI, the government conceded, in September 2015, that the hair-related expert testimony presented at the defendant's trial was false and misleading and that the government knew or should have known this at the time of the trial. The defendant then filed, in September 2016, his first habeas petition, pursuant to 28 U.S.C. § 2255, forty-four years after he was sentenced to life in prison, challenging his conviction on the ground that the government's knowing use of the false hair testimony materially affected the outcome of his trial, in violation of the Fifth Amendment and *Napue v. Illinois*, 360 U.S. 264 (1959). Pet'r's Mot. Vacate Under 28 U.S.C. § 2255 ("Pet'r's Mot."), ECF No. 2. For the reasons explained below, the defendant's motion is denied.

## I.     BACKGROUND

The government reports that its files, "which presumably included reports, grand jury transcripts, witness statements, photographs, and trial exhibits" as well as "all physical evidence recovered in this case . . . no longer exist[]." Gov't's Opp'n Pet'r's Mot. ("Gov't's Opp'n") at 3.[1] Consequently, the Court relies on the trial transcript, which is available in paper format.

---

[1]     At the time of the defendant's conviction, the United States Attorney's Office had a 15-year retention policy for its files, while the D.C. Metropolitan Police Department had a 25-year retention policy. *Id.* at 3 n.1.

The evidence presented at the defendant's criminal trial and pertinent procedural history are reviewed below, followed by an overview of issues with forensic hair matching evidence.

## A. THE TRIAL

The prosecution's theory of the case was outlined in its opening statement: on September 29, 1970, the victim caught the defendant "selling narcotics to two boys" in Apartment 9 at 1312 East Capitol Street NE, a building managed by the victim. Trial Tr. 7/7/71 at 16–17. After the boys fled, the defendant "thereupon commenced to tie up [the victim]" and stuffed "a wad of what appeared to be toilet paper" and "a woman's nylon stocking" in the victim's mouth. *Id*. at 15–16. While trying to strangle the victim, the belt broke and the defendant continued strangling the victim with a telephone cord he found in the apartment. *Id*. at 14–16. The defendant then filled a cola bottle with water and "shoved [the] water down the throat of the victim . . . to make sure he was dead." *Id*. at 17. The defendant took the victim's ring of keys to facilitate his later return to take some of the victim's belongings. *Id*. at 18.

In summarizing the evidence that would support this narrative, the prosecutor referenced the following anticipated evidence: (1) the testimony of the defendant's friends, Dennis Butler and Phyllis "Gail" Robinson, who were dating at the time and to whom the defendant had confessed a detailed account of the commission of the murder, *id*. at 16–17; (2) witnesses who observed the defendant both alone and with the victim on and near the premises of the building where the murder occurred "at various times on that same afternoon in question," *id*. ; (3) the finding of the victim's keys "a period of days" after the murder on a roof "two or three doors adjacent to where the defendant resided at the time," *id*. at 18; and (4) "various scientific

evidence" linking the defendant to the scene of the crime, *id*.  The government did not mention in its opening that this scientific evidence would include forensic hair analysis.

### 1. The Scene of the Crime

The only issue at trial was the identity of the person who killed the victim.  Trial Tr. 7/13/71 at 481 ("The issue in this case is not what happened to Mr. Mears, but who did it.").  The manner of the victim's death was not disputed, *id*. at 480 ("Defense . . . will not contest the fact that Mr. Mears was killed or that he was killed in the way the Government has described it."), and as a result, the defense "made no attempt to cross-examine" any witnesses on issues of how the victim died or the condition of the crime scene, *id*.  The uncontested circumstances and manner of the victim's death, which were established by the testimony of a number of law enforcement personnel, are as follows:

On the evening of September 29, 1970, Jesse Mears was found dead in the bathroom of Apartment 9 on the third floor at 1312 East Capitol Street NE.  Trial Tr. 7/8/71 at 31–33 (testimony of Dr. William Brownlee, Deputy Medical Examiner); Trial Tr. 7/9/71 at 289–90 (testimony of Officer John Lightford).  After someone called 911, the first police arrived at the building around 4:52 P.M., and were joined by the homicide squad "[a]bout 5:30." *Id.*  The police found the door of the apartment unlocked as it did not have a complete door handle on it, and it "appeared as though someone" had been "repairing the lock."  Trial Tr. 7/12/71 at 436 (testimony of Detective Robert Murray).

The victim was found in the bathroom of the apartment with "his hands . . . tied behind his back," with "a garrote around his neck," mouth, and face, and with "a wad of toilet paper tissue paper and a stocking" inside his mouth.  Trial Tr. 7/8/71 at 32–33 (testimony of Dr. Brownlee).  Blood was coming "from the [victim]'s nose and about the mouth," and the area around the victim's left eye "was bruised as if it had been struck some blow."  Trial Tr. 7/12/71

at 441 (testimony of Detective Murray).  The garrote was in fact a telephone cord that appeared to come from a telephone found inside the vacant apartment.  *Id*. at 443–44.  The toilet paper and stocking "were wet" and "the garrote about the neck and face was of sufficient tightness . . . to create grooves within the skin."  Trial Tr. 7/8/71 at 34 (testimony of Dr. Brownlee).  The contents of his mouth were soggy, "not dripping," and subsequent testing revealed that the wetness had not been caused by saliva.  *Id*. at 36, 51.

The police found "a Pepsi cola bottle that was lying near [the victim's] head" with water in it, and "water staining the floor underneath his head and [his] left shoulder."  *Id*. at 37.  Paint was found on the victim's clothing and on the bottle, which paint appeared to come from the same source.  Trial Tr. 7/13/71 at 518 (testimony of Special Agent David Nichols).  The victim was not found wearing a belt, but a belt that may have fit him was found in two pieces in the kitchen of the apartment.  Trial Tr. 7/13/71 at 524 (testimony of Special Agent Myron Scholberg).  Of sixteen "partial latent" fingerprints found at the crime scene, none of them matched the defendant or the victim.  Trial Tr. 7/9/71 at 204 (testimony of Officer Donald Cherry).

The time of the victim's murder was placed as likely between 2 P.M. and 3 P.M. on September 29, 1970, Trial Tr. 7/8/71 at 37–38, 60 (testimony of Dr. Brownlee), and his cause of death was "asphyxiation second to garroting," or "strangulation," *id*. at 38.

### 2.  The Day of the Murder

Seven witnesses testified that they saw the victim, the defendant, or both, on the day of the murder.  James Hill, who had known the defendant for "about three years," and Phyllis "Gail" Robinson, who had been dating Hill, testified that on the day the victim's body was found the defendant had visited them and confessed to the murder, including details of the crime. Lawrence Robertson and John Taylor, who were performing maintenance at the building where

the murder occurred on the day of the murder, saw the victim at various times during the morning and afternoon at the building. Two relatives of the defendant's girlfriend, Mary Dean, testified about when they saw the defendant the day of the murder: Wilson Dean, the girlfriend's brother, saw the defendant at various times throughout the day near the apartment building where the murder occurred, and Ellen Johnson (née Dean), the girlfriend's sister, saw the victim the day of the murder, both before and after his death.[2] Charles Barber, who lived nearby, testified that he saw both the victim and the defendant together on the day of the murder. The examinations of these seven witnesses are summarized below.

### i. *James Hill*

On direct examination, Hill testified that on the day of the murder, he contacted the defendant by phone "[a]bout 3:00 or 3:30," and the defendant volunteered that he was leaving the apartment building of Ellen Johnson, his girlfriend's sister, where "[h]e had just killed . . . Ellen[]'s rent man." Trial Tr. 7/8/71 at 66–67. The defendant said that "the old man caught him selling narcotics to two boys," so "[the defendant] tied the old man up, . . . put a stocking or something in his mouth," and began to choke him with a belt. *Id.* at 67. After the belt that he was using broke, "he started choking him with a telephone cord," and when the defendant was finished, "he poured some water down [the victim's] throat to make sure that he was dead." *Id.* Hill further testified the defendant said that he killed the victim in "[t]he bathroom" of the "[u]pstairs apartment." *Id.* at 73.

The defendant came to Hill's house around 4:00 P.M. and told Hill "about the keys he had got" to the victim's apartment or car, and that "[h]e was going back up there later." *Id.* at 68.

---

[2]     At the trial, Mary Dean (the defendant's girlfriend), Wilson Dean, (her brother), Marnette Dean (her sister), Ellen Johnson (her sister), and Catherine Johnson (no relation) all testified. Given the multiple witnesses with the same last name "Dean" and "Johnson" in this case, these witnesses are referred to by their first names.

Soon after, Hill went upstairs to his girlfriend Robinson's apartment, and called for the defendant and Robinson to come upstairs. *Id.* at 69. Once all three were upstairs, Hill told Robinson, with the defendant's permission, that the defendant "had just killed a man," after which the defendant "told Gail he was choking a man with a belt, and the belt broke, and he started choking him with a telephone cord." *Id.* at 69–70. Neither the defendant nor Hill told Robinson any other details about the murder. *Id.* at 70.

On cross examination, Hill admitted to his significant heroin use, including on the day of the murder, as well as the fact that the defendant was his heroin supplier. After first denying having a "specific reason" for calling the defendant the day of the murder, *id.* at 77–78, Hill, when pressed by defense counsel, admitted that he "was calling [the defendant] because of narcotics," to get heroin, *id.* at 79. Hill admitted that he had used "two caps" of heroin the day of the murder, supplied to him by the defendant after they met at Hill's house, *id.* at 108, and that, prior to the murder, he regularly used heroin, averaging "four caps per day," Trial Tr. 7/9/71 at 146. Hill also denied using drugs since the day of the murder, Trial Tr. 7/8/71 at 112–13, or using methadone for a number of months prior to trial, *id.* at 113, but then testified, when pressed, that he was in fact using methadone at the time of the trial and had been using methadone for some time, Trial Tr. 7/9/71 at 141–42. He further testified that Robinson used heroin as well and had snorted some the evening of the confession in front of the defendant and Hill. *Id.* at 93–95. In addition to these admitted inconsistencies in his testimony about his drug use, Hill's testimony was also inconsistent as to whether, on the day of the murder, he had called the defendant or the defendant had called him first after the murder. *Id.* at 147–49.

The cross-examination of Hill illuminated additional details about the police investigation the day after the murder. Hill testified that the police "came to [his] house" the morning after the

murder because, the police told Hill, the victim's keys were "supposed to be upstairs underneath [his] mattress." Trial Tr. 7/9/71 at 160–61. The police unsuccessfully searched Hill's apartment for the keys and then took Hill, along with his girlfriend Robinson, and the defendant's girlfriend, Mary Dean, to "No. 1," the police station, where they were interviewed separately. *Id*. at 161–63. Hill was aware at the time that the defendant "had already been charged and locked up for th[e] homicide" and, at the station, "told [the police] what [the defendant] had told him." *Id.* at 172–75. Hill could not remember if the police threatened "to lock [him] up if [he] didn't tell the truth" or if he had told the defense investigator the police had threatened to punish him if he did not tell the truth, *id.* at 173, but admitted to having spoken to the defense investigator "several months after" the murder, *id.* at 174–75. Hill denied that the police had threatened to prosecute him for homicide in connection with the murder. *Id*. at 174–75.[3]

On re-direct, Hill confirmed that "the statement he made to the police was true and accurate to the best he could remember." *Id*. at 185. Hill also denied any motive to lie or inculpate the defendant, including denying ever seeing the defendant and Hill's girlfriend Robinson behaving intimately with one another. *Id.* at 191–92. Hill told the police what he knew because he found out he "could get in trouble" for not being honest about what he knew as a witness to the confession. *Id.* at 187.

### ii. *Phyllis "Gail" Robinson*

Hill's girlfriend, Phyllis "Gail" Robinson, testified on direct examination that on the day of the murder, September 29, 1970, she arrived at Hill's house at 4:30 P.M. and found the defendant and Hill injecting heroin into their arms. *Id*. at 235–36. Robinson was given some

---

[3]    Officer Otis Fickling, who interviewed Hill and Robinson, testified at trial that he did not believe they were under the influence of narcotics at the time they gave their statements, Trial Tr. 7/13/71 at 494, and on cross-examination he denied "pressur[ing] anyone in[t]o giving" their statements, *id.* at 508.

heroin as well "but [she] didn't take it right then." *Id*. at 236. She did, however, admit to some

use of heroin beginning in June 1970 before the murder, and claimed to have stopped four

months later. *Id*. at 233–34. After receiving the defendant's permission, Hill told her that

"Dennis just killed a man," *id*. at 236–37, and the defendant himself explained that "he was

choking the man with a belt and the belt broke and then he started choking him with the

telephone cord," *id*. at 238–39. Hill told her that the defendant killed the victim because he

"caught [the defendant] selling narcotics in the bathroom to two boys." *Id*. at 239. The

defendant and Hill did not tell Robinson "anything else." *Id*. at 239. Robinson denied any

"animosity ill-will, or hatred" between the defendant and her or between Hill and the defendant.

*Id.* at 243.

Nevertheless, on cross-examination, Robinson admitted that she used drugs on the day of

the murder, but stated that she used them "after [the defendant] left." *Id*. at 249. She testified

that she never received drugs from the defendant, only from Hill, and that she "only took drugs

on weekends." *Id*. at 248. In response to cross examination questions implying that Robinson

would exchange sex with the defendant for drugs, Robinson made clear that she did not "know

[the defendant] that good" and that she and the defendant were only friends. *Id*. at 245–47, 260–

62.

Robinson admitted that she initially lied to the police twice, first telling the police she

knew nothing about the murder and later "telling the police" she had learned about the murder

from Hill only. *Id*. at 252–60. She explained that she had lied because she "was scared," and

having "never been in trouble," she did not want to "have [any]thing to do with [the murder investigation]." *Id*. at 257–59, 262–63.

On-redirect, Robinson testified that, after the police noted inconsistencies between her and Hill's statements, she told the police the "complete truth" that she had spoken to the defendant directly after the murder. *Id*. at 266–69.

### iii. *Robertson, Taylor, and Barber*

Both Lawrence Robertson and John Taylor were at 1312 East Capitol Street NE "installing a water meter" on the day of the murder. Trial Tr. 7/9/71 at 272. Robertson saw the victim in the morning, when the victim came out of the building to check on what Robertson and Taylor were doing. *Id*. at 272–73. Later, around 1:30, Robertson saw the victim with "a middle-aged man," whom he "wouldn't be able to recognize" and whose physical characteristics he did not describe. *Id*. Robertson also testified that he did not "see anybody running out of the apartment that afternoon." *Id*. at 276.

Taylor first saw the victim in the morning at the same time as Robinson, saw him again "around lunch time," when he "came over to the truck and wanted to know the exact time," and again at "approximately 1:30 or 1:45," when he "and some other guy walk[ed] out to the street [to] look[] in a car." *Id*. at 277–78. Taylor saw the victim a fourth time, "at around 2:30," when he saw the victim "standing in the hall talking to another fellow," whom Taylor "didn't get a good look at" and whom Taylor likely would not be able to recognize. *Id*. at 278, 283. Taylor finished work "somewhere around 3:20 or 3:25." *Id*. at 282.

Charles Barber testified briefly that on the day of the murder, he was walking home "up 13th to East Capitol" when he went "past 1312 East Capitol Street . . . around 12:30 or 1:00 o'clock." *Id*. at 284–86. Near the building, he saw the defendant and "another man under the

hood of [a] car." *Id*. at 285.  Barber identified the unnamed man as "the man who owned the

place," noting that he was "old," "white," and "thin." *Id*. at 284–86.  He further testified that "it

looked like they were working on the car" together. *Id*. at 287.

### iv.   Ellen Johnson

At the time of the murder, Ellen Johnson, the sister of the defendant's girlfriend, lived at

1312 East Capitol Street NE, the building where the victim's body was found.  Trial Tr. 7/9/71 at

293.  Ellen knew the victim as "her rent man." *Id*.  Ellen testified that she saw the victim in the

morning, when he "knocked on [her] door," and again "when [she] got home" that day, after a

man "knocked on [her] door and told [her] to come up to the apartment and see [the victim's]

body." *Id*. at 294–95.  She went to the apartment and saw that the victim had "something white

stuffed in his mouth and a cord around his neck and his hands were tied behind his back." *Id*. at

295.  Later that day, she spoke to Hill on the phone and told him that "someone just killed [the]

rent man," *id*. at 297, but denied telling him "any details of what [she] saw" and did not

"describe the body" to him, *id*. at 298.[4]  At the end of the trial, Ellen was called back for brief

rebuttal testimony and confirmed that she did not speak with anyone other than Hill and people

at the crime scene before midnight that evening.  Trial Tr. 7/14/71 at 685–86.

### v.   Wilson Dean

Wilson Dean, the brother of the defendant's girlfriend, worked for the victim "for about

three weeks" prior to his murder.  Trial Tr. 7/12/71 at 375–77.  Wilson testified that three days

---

[4]     The government asserts that the jury heard testimony from Ellen Johnson concerning a robbery that had
occurred twelve days earlier.  Gov't's Opp'n at 5–6 (citing Trial Tr. 7/21/ 71 at 331–70).  As the defendant correctly
notes, however, "the judge precluded the witness from providing th[is] testimony to the jury."  Pet'r's Reply Supp.
Mot. Vacate ("Pet'r's Reply") at 7, ECF No. 53.  The government did not address or correct this portion of its brief,
even after the defendant pointed out the error, despite the government filing, without leave, a surreply. *See* Gov't's
Surreply Pet'r's Mot ("Gov't's Surreply"), ECF No. 10. *See Ki Sun Kim v. United States*, 840 F. Supp. 2d 180, 191
(D.D.C. 2012) ("The Local Rules of this Court contemplate that there ordinarily will be at most three memoranda
associated with any given motion, [but] the non-movant may seek the district court's leave to file a surreply.").

before the murder, he had been painting the apartment in which the victim's body was later found, and that the defendant "came up" to the apartment that day as it was being painted. *Id*. at 382–83, 393. Wilson was painting the apartment "green" or "turquoise," and "left a paint pan," "a roller," and "a bucket of paint . . . in the sink." *Id.* at 383–84. At this time, Wilson found a dog leash and collar, like the one used to bind the victim, and a woman's "white stocking" in the apartment, which he "did not take" with him. *Id*. at 386–89.

On the day of the murder, Wilson testified that he saw the defendant "between two and three o'clock . . . coming up C street." *Id.* at 377–79. Wilson did not "know where [the defendant] was coming from," *id.* at 380, but noted that Wilson's house, where the defendant often stayed with Wilson's sister, Mary Dean, was somewhere "around the corner" from 1312 East Capitol Street NE, where the murder occurred, *id.* at 378.[5] Wilson saw the defendant again on the day of the murder "between five and five-thirty" in Wilson's house. *Id.* at 381.

On cross-examination, Wilson confirmed that he had seen the defendant "between two and three o'clock" the day of the murder, and testified that he had spoken with the police the next day and told them he had seen the defendant "about two o'clock." *Id.* at 395. He also acknowledged that he had seen the defendant earlier in the morning when he gave the defendant a haircut, *id.* at 394–95, and on a brief redirect, described that he had "trimmed the sides and evened it up on the top," *id.* at 397–98.

### 3. Victim's Key Ring Testimony

The government called four witnesses to testify regarding a ring of keys that belonged to the victim and were found approximately thirteen days after the murder on the roof of a house

---

[5]     This part of the transcript contains a dialogue between the prosecutor and Wilson about the location of 1312 East Capitol Street NE "in relation to [Wilson's] block," but Wilson's responses were given demonstratively instead of orally, leaving the details of Wilson's testimony unclear.

two or three doors down from the house where the defendant's girlfriend lived and the defendant often stayed.  Trial Tr. 7/12/71 at 405.  Alonzo Syndor testified that on October 12, 1970, he and some friends were playing in an alley "on the 1200 block of C Street, Northeast," when "[a] man threw some keys" to one of his friends "off the roof" of a nearby building.  Trial Tr. 7/12/71 at 399–403.  Vance Dean, a second brother to the defendant's girlfriend, testified that he was playing with Syndor, who gave him the keys, after which Vance gave them to James Johnson.  *Id.* at 406–08; 410.  Vance also testified that the keys were thrown from the roof of "1213" and that he lived at "1219" on that same street.  *Id.* at 407.

James Johnson lived in the apartment building where the victim was found and testified that after receiving the keys from Vance, he gave the keys to "Bob [Robert] Taylor, the manager of the house."  *Id.* at 419-B.  James Johnson also testified that it was possible to access the apartment building at 1312 East Capitol Street NE through his backyard, and that on the day of the murder, his dogs had been let out of his backyard by an unidentified individual.  *Id.* at 419-D.  He further testified that one of his dogs "would bite anybody that didn't know him" if they tried to enter the yard, and that the dogs knew the defendant.  *Id.* at 417–19-A.

Robert Taylor testified and confirmed that the keys given to him by James belonged to the victim.  *Id.* at 431–33.  He also testified that the victim, the building's "rent man," had "a small black wallet that he carried all the time," that it was the victim's "practice to carry money" in his wallet, and that the victim also "ke[pt] money in the trunk of his car."  *Id.* at 433.

### 4.  Expert Paint Testimony

The government presented the expert testimony of FBI Special Agent David W. Nichols, a specialist in "instrumental analysis," which involved conducting examinations "on such items as paint, plastics, and metals," regarding paint found on multiple items at the scene of the crime as well as on the defendant's clothing.  Trial Tr. 7/13/71 at 514–15.  As part of the investigation,

13

Nichols "removed . . . two specimens of paint . . . from two articles of clothing that were submitted to the FBI Laboratory," a pair of pants owned by the defendant's and the coat the victim was wearing when he was found, and one from the "pepsi cola bottle" found at the scene of the crime. *Id*. at 515–17. Nichols "found blue-green colored paint on each of the items," and testified that the paint was "similar to one another or the same as one another in color, texture, and type of paint." *Id*. at 517–18. Based on this examination, he "concluded that the[] three paint deposits could have come from the same source." *Id*. at 518. He further testified that "[t]he paint that was on each of the[] items was applied while wet," and that it "wasn't smeared on the clothing or the bottle," but merely adhered to the items. *Id*. at 518–19. This witness was not asked to make a definitive conclusion about whether the paint samples came from the same source, and he was not cross examined. *Id.* at 519.

### 5. Forensic Hair Testimony

On the third day of trial, as the penultimate witness in the government's case-in-chief, the government called FBI Special Agent Myron Scholberg, who was "assigned to the FBI Laboratory in Washington, D.C." and specialized in hair and fiber analysis, to testify about two issues at trial: first, how the belt found at the scene of the crime likely broke, and second, the findings of comparative hair analysis that he performed on hair samples found on the clothing of the victim and hair samples from the defendant. *Id*. at 521–23. Agent Scholberg's testimony accounts for no more than twenty pages of a 200-page transcript for this trial day. After recounting his qualifications and experience, *id*. at 522, as well as the process by which he acquired the evidence for inspection, *id*. at 523–24, Agent Scholberg turned to the substance of his testimony. Regarding the belt, he testified that "the[] two pieces of belt" found in the kitchen of the apartment, "were once one belt" and that "the ends were torn, which would indicate that

some pressure or force was applied in order to sever th[e] belt," that the "edges of th[e] belt were not cut," but "were torn apart." *Id*. at 524.

As to the hair evidence, Agent Scholberg first explained the process by which he compared hair samples he had received, *id*. at 525–26, which included "a direct microscopic comparison test on the hairs" by means of "a comparison type microscope," which allowed him to "view two slides simultaneously," *id*. at 527. Agent Scholberg further explained that his analysis involved comparing "approximately 16 different characteristics" of each hair, and based on comparison of these sixteen different characteristics, he determined that the hair taken from the victim's clothing "were microscopically the same or alike the hairs that were identified" as having come from the defendant, meaning that the hairs from the victim's clothing "could have come from the head of the defendant." *Id*. at 528–30.

Agent Scholberg went on to testify that of the roughly 10,000 hair examinations he had performed, "there ha[d] been four or five times when the hair of the *suspect* and the hair of the *victim* was so nearly alike" that he "was unable to come to a conclusion as to" whether the hair originated from the suspect or from the victim. *Id*. at 531 (emphasis added). He specifically qualified his testimony that the hairs were "the same" by saying that "hairs do not contain enough identifying characteristics to be positively identified to the exclusion of all other individuals," *id*. at 530, and emphasized that his testimony was that "the [hairs] are the same or alike in all microscopic characteristics that were available to [him]," *id*. at 530.

On cross examination, Agent Scholberg confirmed that he could not say "positively . . . that the[] hairs originated from the head of the defendant." *Id*. at 531–32. When defense counsel asked Agent Scholberg to provide a number for "how many other people have the same microscopic characteristics" as the defendant, Agent Scholberg responded that he "ha[d] no idea

whether anyone would have the same [set of] microscopic characteristics" as the defendant, and that the number could "be no one or it could be someone" and that he had "no basis to . . . assign a number to it." *Id*. at 536.

### 6. The Defense

Defense counsel called five witnesses, whose testimony largely focused on challenging the credibility of Hill and Robinson, who had recounted the defendant's confession.[6]

#### i. *Joel Goodman*

Joel Goodman worked as an investigator for the Public Defender Service in Washington, D.C. Trial Tr. 7/13/71 at 566. Goodman met with James Hill on two occasions to discuss Hill's knowledge of the murder and the alleged subsequent confession by the defendant. *Id*. at 566–67. Goodman testified that, contrary to Hill's testimony at trial, Hill had originally said that the defendant had called Hill on the night of the murder, rather than Hill calling the defendant. *Id*. at 570. He further testified that, contrary to Hill's testimony that the defendant was present at Hill's house for roughly ninety minutes on the night of the murder, Hill had told him that the defendant was at the house for only fifteen minutes. *Id*. at 571. Hill had told Goodman that the police threatened to "put [Hill and Robinson] in jail" if they "did not talk." *Id*. at 575. On cross-examination, Goodman admitted that he did not record or transcribe his first meeting with Hill, but took notes of his recollections after the meetings had occurred, and further admitted that he did not have Hill review or sign his notes from either meeting. *Id*. at 580–83.

#### ii. *John Stevenson*

John Stevenson testified that he knew both the defendant and Hill, and that he recognized, but did not personally know, Robinson. *Id*. at 591–92. Stevenson testified that he

---

[6]      At the close of evidence, the defendant confirmed that he did not wish to testify and defense counsel informed the Court that he had advised the defendant not to testify. Trial Tr. 7/14/71 at 674–75.

twice saw the defendant and Robinson together, without Hill, when he left Robinson and the defendant alone at his home. *Id*. at 593, 596–97. He disclaimed personal knowledge as to what the defendant and Robinson did in his house while he was gone. *Id*. at 594–97. On cross-examination, Stevenson explained that he considered the defendant a friend, but was closer to Hill. *Id*. at 599–600, 603–04. He testified that he had never been to Hill's house, but Hill had been to his house an unspecified number of times. *Id.* at 609–10.

### iii.    *Mary Dean and Marnette Dean*

Mary Dean, the defendant's girlfriend and mother of his child, testified that she saw the defendant some time "between 12:30 and 3:30" P.M. on the day of the murder, soon after she woke up. Trial Tr. 7/13/71 at 621–23. She testified that Hill had called for the defendant before 3:30, but that she did not tell the defendant about the call. *Id*. at 624–25. Later that evening, between 6:15 and 6:45, Mary received a call from her sister, Lillian Harring, who told her about the murder. *Id*. at 627–29. According to Mary, Harring had learned the details from Ellen Johnson, Mary's other sister, and after the conversation Mary discussed the murder with everyone who was in the room: Marnette Dean, another of Mary's sisters, Wilson Dean, Mary's brother, and Hill. *Id*. at 628–30. This discussion included "the details of how [the victim's] body was found," but Mary did not elaborate as to what those details were. *Id*. at 631. The defendant arrived home a short time later, around 7:00 P.M. *Id*. at 627.

On cross examination, Mary Dean admitted that she did not give a statement to the police the day after the murder when she was brought in for questioning. *Id.* at 634. She denied, however, that she had "refus[ed] to give a statement to the police" and maintained that the police "told [her] they didn't need to take a statement from [her]." *Id.*[7] She testified that she once

---

[7]    Metropolitan Police Officer Fickling was briefly recalled for rebuttal and testified that he had "asked her"

17

observed the defendant and Robinson "hugging or kissing" on the street, but she was "not sure which" and did not know if they were "playing a joke on [her]." *Id* at 643. She further testified that this "made her mad" and so she went "directly" to the store, but she noted that Hill may have been in a position to see them. *Id.*

Marnette Dean, the defendant's girlfriend's sister, briefly testified that she saw the defendant three times on day of the murder at her home where she lived with the defendant's girlfriend and other family members, at "fifteen after nine," around noon, and again "late in the afternoon" around sunset. *Id.* at 616–18.

### iv.    *Catherine Johnson*

Catherine Johnson, a friend of the defendant, testified that the defendant's girlfriend's sister, Ellen Johnson—no relation to the witness—told her about the murder "around five o'clock" on the day that it occurred, Trial Tr. 7/14/71 at 663–65, and "ten minutes later," she ran into the defendant "over Lincoln Park" and she asked him if he "had []heard about Mr. Mears being killed," *id.* at 666. The defendant "acted surprised when [she] told him" and they "sat on the steps in the park" and talked for "about fifteen minutes." *Id.* at 667–68.

## 7.   Closing Arguments and Verdict

At the close of evidence, defense counsel orally "move[d] for acquittal on all counts" at a bench conference. *Id.* at 688. The defendant did not explain on what grounds the motion was made, and the government summarily argued that "it is a jury question." *Id.* at 688. The Court, after discussing the sufficiency of the evidence to prove premeditation on the part of the defendant, "den[ied] the motion with respect to" the felony murder and robbery charges," and reserved ruling on the murder in the first degree charge. *Id.* at 688–90. The trial then proceeded

---

to give a statement that day, but that she had refused to give "any statement" after "talk[ing] to her lawyer." Trial Tr. 7/14/71 at 686–87.

to closing arguments.

*i. Prosecutor's Summation*

The prosecutor's summation summarized how the victim had been murdered and robbed, *id.* at 714–19, and then reviewed in the evidence presented at the trial, *id.* at 719–735, emphasizing Hill and Robinson's testimony, *id.* at 719–722, and the evidence that corroborated their accounts, *id.* at 722–35. While acknowledging these witnesses' drug use, the prosecutor emphasized that Hill and Robinson had no motive to lie about their "friend's" actions, and pointed out that the crime scene corroborated their statements of the defendant's confession, especially given the details Hill and Robinson provided but would not be established until later forensic testing, such as what made the stocking in the victim's mouth wet and that the murder occurred before 3:30 P.M. *Id.* at 722–23. The prosecutor also highlighted the three witnesses who saw the defendant and/or the victim near the apartment building around the time of the crime, emphasizing the witness who saw the two together, *id.* at 723–26, as well as the fourth witness, Wilson Dean, the defendant's girlfriend's brother, who testified that he saw the defendant coming down the street from the direction of the building where the murder occurred between two and three o'clock, *id.* at 727. In addition, he noted that the location where the victim's keys were found corroborated Hill and Robinson's testimony. *Id.* at 729.

The government next briefly discussed the expert paint evidence, *id.* at 730–31, and Agent Scholberg's hair testimony, *id.* at 731–32. Regarding the latter, the prosecutor began by posing the question: "Now what did he testify to? He testified to certain hair that was found on the victim's clothing: on his shirt and on his jacket and on his pants." *Id.* at 731. The prosecutor reminded the jury about the limitations of the hair analysis, stating that Agent Scholberg "couldn't say whose hair it was. No, the FBI, unless they are positive and can say without any

qualification, they will not say that is someone's hair.  But he did say that hair is not capable of exact identification, that he can't' say for sure, he can't be positive it is that person."  *Id*.  Next, the prosecutor summarized the conclusions that were drawn from the hair analysis, stating, "However, he said out of all the combinations that are possible, the sixteen characteristics and the lack thereof, and you heard about the cortex and the various types of the cortex and the direction of the fibers and so forth.  Out of all these factors, what did he find?  He said when he compared the hairs that were found on the victim's clothing with the defendant's hairs that were taken by Detective Fickling from him at the infirmary, when he compared those two, what were they?  They were the same in every microscopic detail, the same."  *Id*.  In assessing the probative value of that finding, the prosecutor stated, "I said, how often, Agent Scholberg, does it happen?  You can't be positive, yes, but how often does it happen that two people's hair, two different people, are so similar and so alike that you would be unable to tell?  Out of 10,000 examinations, he said he recalls it happening approximately four times."  *Id*. at 732.

Notably, the prosecutor then repeated his caution that "[w]e are not saying find him guilty on that evidence.  We are saying consider it, ladies and gentlemen, consider it along with the other evidence, and it starts to add up.  It starts to add up, doesn't it?"  *Id.* at 732.

In his concluding remarks, the prosecutor observed that no testimony of the defense witnesses was inconsistent with the government's theory of the case.  *Id.* at 733–35.  Further, he repeated that the jury was not being asked "to find [the defendant] guilty just on one piece or two pieces" of evidence, but to take "all the circumstantial evidence," the "extraordinary

coincidences," the "scientific evidence," and "the defendant's own admission of his guilt," and to then find the defendant guilty.  *Id.* at 735–36.

       *ii.*     *Defense Summation*

Defense counsel focused his closing argument largely on the credibility of the government's "two star witnesses, Jimmy Hill and Gail Robinson."  Trial Tr. 7/14/71 at 751.  He reviewed the inconsistencies and misstatements in Hill and Robinson's testimony, both about their drug use and about how they learned about the murder, and posited that any details these witnesses relayed about the crime scene could have been told to them by someone who had been at the crime scene in the time between the murder and the time Hill and Robinson gave their statements to police the next day.  *Id*. at 752–54, 756–57.  Based on flaws in their testimony, defense counsel urged the jury to conclude that Hill and Robinson "lied to [the jury] on the stand."  *Id*. at 756.  He also challenged the corroborating evidence, arguing that the other witnesses' testimony and the key ring evidence showed little more than that the defendant lived in the neighborhood and was near the scene of the crime.  *Id.* at 759–66.

With respect to the forensic evidence, defense counsel pointed out that the defendant could have gotten paint on his clothing when he had visited Wilson Dean a few days prior to the murder when Wilson was painting the apartment.  *Id.* at 767–68.  Regarding the hair testimony, defense counsel emphasized that Agent Scholberg "could not be sure" to whom the hair collected at the scene belonged.  *Id.* at 768.  As the defense counsel explained, Agent Scholberg had used the figure "four or five out of 10,000" in connection with how often he reached an inconclusive result from hair analysis, but this figure specifically referred to cases in which he was unable to distinguish between the "hair of the decedent and the hair of the suspect," which was irrelevant because, in this case, the defendant and the victim were of different races.  *Id.* at 768.  He also

noted that, even if the hair belonged to the defendant, the defendant and victim "were seen under the car, under the hood of the car" working together before the murder and the hair could have been transferred to the victim's clothing at that point. *Id.* at 769.

### iii. Prosecutor's Rebuttal Summation

The government's rebuttal was short, consisting of only fourteen transcript pages. *Id.* at 771–85. This rebuttal recapped Hill and Robinson's testimony regarding the defendant's confession, the testimony placing the defendant near the crime scene at around the time of death, the evidence collected from the crime scene corroborating Hill and Robinson's testimony, and the witnesses' testimony about the victim's key ring. *Id.* at 772–79. Despite the attacks on their credibility, the prosecutor argued that Hill and Robinson's testimony about the defendant's confession "w[as] not impeached on the witness stand." *Id.* at 779. In summarizing the evidence, the prosecutor made only brief reference to the hair evidence as follows: "You have the FBI report saying that this man's hair compared with the hairs found on the body of the dead man. They are the same in every microscopic characteristic—every one. You heard the sixteen possible combinations, lack thereof, etc. Every one matched." *Id.* at 783–84. The government concluded by arguing that "[e]very possible item points directly to [the defendant]," and again urging the jury to "take all of the evidence" into consideration. *Id.* at 784–85.

### iv. The Jury Verdict

The next day, on July 15, 1971, the Court instructed the jury on each of the three counts, as well as lesser included charges, and after deliberation, the jury found the defendant guilty of murder in the first degree, felony murder, and robbery. *See generally* Trial Tr. 7/15/71. The

defendant was sentenced to "terms of 20 years to life on the murder charges and 5–15 years on the robbery count." *United States v. Butler*, 481 F.2d 531, 532 (D.C. Cir. 1973).

### 8. Subsequent Procedural History

The defendant filed a direct appeal, raising two trial issues: (1) "whether the trial judge erred in not ordering two key prosecution witnesses," Hill and Robinson, "to undergo physical and psychiatric examinations;" and (2) "whether the court erred in admitting the testimony of a police officer as to whether those witnesses were under the influence of narcotics when they made statements to the police." *Butler*, 481 F.2d at 532.[8]  The D.C. Circuit summarized the evidence presented at trial against the defendant, which evidence the Circuit described as "overwhelming." *Id.* at 532–35.  The Circuit mentioned the hair testimony once in passing, *id.* at 533, and instead focused heavily on the fact that Hill's and Robinson's statements to the police were strongly corroborated by the crime scene evidence and did not appear to be contradicted by any other evidence. *Id.* at 532–35.

As to whether the district court erred in not ordering examinations of Hill and Robinson, the D.C. Circuit recognized that the testimony of these two witnesses "present[ed] a particular danger of unreliability" because they were heroin users, and that their drug use implicated "a number of unresolved but material questions," including whether Hill and Robinson were influenced by the "very powerful motive to fabricate a case" in order to avoid indictment for their own criminal drug use. *Id.* at 534–35.  The Court concluded, however, that Hill and Robinson's testimony was "comprehensive and believable" and, "[m]ore importantly . . . supported by overwhelming extrinsic corroboration." *Id.* at 535.  Furthermore, the questions

--------

[8]      The defendant also raised a third issue that related only to sentencing: "whether appellant was properly denied sentencing under the Youth Corrections Act."" *Butler*, 481 F.2d at 532, 536–537.  On this issue, the Circuit held that because the sentencing judge "articulated independent reasons for finding [that] appellant would not benefit from Youth Act treatment," the Court had no grounds on which to reverse that decision.

raised about Hill and Robinson's drug use were deemed insufficient to require reversal since the

jury had been "put on notice" about their ongoing drug use, which meant that the jury knew that

"to the extent the witnesses' testimony was uncorroborated, it should be weighed with caution."

*Id.* at 535.  On this basis, the Circuit concluded that "the trial court's refusal to order

examinations" did not constitute "an abuse of discretion."  *Id.*  For these same reasons, the Court

held that whether Hill and Robinson were using drugs at the time they gave their statements to

the police "went to the credibility of the testimony for which there was substantial extrinsic

corroboration," and any error "would have been harmless."  *Id.* at 536–37.  After resolution of

his direct appeal, the defendant has filed no other post-conviction motions.

### B.  DEVELOPMENTS CONCERNING COMPARATIVE HAIR ANALYSIS IN COURTS

Following "allegations of improper practices by certain [FBI] examiners," DOJ

established a task force to evaluate, among other things, the use of hair evidence in criminal

trials.  Pet'r's Mem. Supp. Pet'r's Mot. ("Pet'r's Mem.") Ex. B at 1–2 (Letter, dated September

22, 2015, from Vincent H. Cohen, Jr., Acting United States Attorney for the District of Columbia

to Sandra Levick, Public Defender Service (the "Cohen Letter")), ECF No 2-1.  The task force

uncovered evidence confirming some examiners' use of these "improper practices," *id.* at 1,

prompting the Congress to task the National Research Council, whose work involves "furthering

knowledge and advising the federal government" on issues of science, Comm. on Identifying the

Needs of the Forensic Science Cmty., Nat'l Research Council, STRENGTHENING FORENSIC

SCIENCE IN THE UNITED STATES: A PATH FORWARD ("Strengthening Forensic Science") (2009) at

3 (available at https://www.ncjrs.gov/pdffiles1/nij/grants/ 228091.pdf), with "examining ways to

improve the quality of forensic sciences," Brandon L. Garret & Peter J. Neufeld, INVALID

FORENSIC SCIENCE TESTIMONY AND WRONGFUL CONVICTIONS, 95 Va. L. Rev. 1, 7 (2009).   In

2009, the Council issued a report concluding that "[f]orensic science research is not well supported," and, as relevant to this case, that "[n]o scientifically accepted statistics exist about the frequency with which particular characteristics of hair are distributed in the population." *See* STRENGTHENING FORENSIC SCIENCE at 15, 160. The study recognized that previous studies of hair comparison analysis have "been shown to be unreliable," and the committee "found no scientific support for the use of hair comparisons for individualization in the absence of" DNA testing. *Id.* at 160–61.

Subsequent to the publication of this report, and "after the exonerations of several individuals whose convictions had rested in part on the introduction at trial of faulty hair comparison analysis or testimony, . . . the FBI, in coordination with the [DOJ], initiated a comprehensive review of microscopic hair comparison analysis or testimony" provided in over 20,000 cases that were litigated before December 31, 1999. Cohen Letter at 1–2. The purpose of this review was "to ensure that analysis or testimony by FBI Lab personnel regarding hair comparison properly reflected the bounds of science, and that no person was deprived of a fair trial based on flawed analysis or testimony." *Id.* at 2.[9] As of September 2015, this review identified 3,118 cases that rested at least in part on "positive associations between hair evidence and a known sample." Pet'r's Mem. Ex. C at 1 (Letter, dated September 15, 2015, from Peter J. Kadzik, Assistant Attorney General to Richard Blumenthal, United States Senator (the "Kadzik Letter")), ECF No. 2-1. The specific types of errors identified included an FBI examiner testifying that hair comparison analysis can identify "a specific individual to the exclusion of all others," which "exceeds the limits of the science"; an FBI examiner assigning some sort of

---

[9] At around the same time, the U.S. Attorney's Office for the District of Columbia also "began its own review of cases prosecuted to conviction in the District of Columbia Superior Court that involved an analyst's report of, or the introduction of testimony regarding, a positive hair association." *Id.*

statistical weight or likelihood of a match between hair samples "that could lead the jury to believe that valid statistical weight can be assigned to a microscopic hair association"; and an FBI examiner using the number of times he or she had been unable to make a match in previous cases "to bolster the conclusion that a hair belongs to a specific individual." Pet'r's Mem. Ex D at 1 ("Microscopic Hair Comparison Analysis," Department of Justice, dated November 9, 2012), ECF No. 2-1.

Based on these reviews, the DOJ and FBI "have formally acknowledged that nearly every examiner in [the] elite FBI forensic unit gave flawed testimony in almost all trials in which they offered evidence [about hair matches] against criminal defendants over more than a two-decade period." *Gimenez v. Ochoa*, 821 F.3d 1136, 1144 n.4 (9th Cir. 2016) (quoting Spencer S. Hsu, FBI ADMITS FLAWS IN HAIR ANALYSIS OVER DECADES, Wash. Post (Apr. 18, 2015), https://www.washingtonpost.com/local/crime/fbi-overstated-forensic-hair-matches-in-nearly-all-criminal-trials-for-decades/2015/04/18/39c8d8c6-e515-11e4-b510-962fcfabc310_story.html?tid=a_in) (second alteration in original). Given this finding, the United States has decided that, in cases challenging convictions based on the improper use of forensic hair evidence, "in the interest of justice, the government is waiving reliance on the statute of limitations for collateral attack on any legal claims arising from erroneous statements in laboratory reports or testimony." Kadzik Letter at 2. Additionally, "the government will not dispute that [any identified] erroneous statements [about hair evidence] should be treated as false evidence and that knowledge of the falsity should be imputed to the prosecution." *Id.*

### C. THE DEFENDANT'S PENDING § 2255 MOTION

The reviews initiated by the FBI and the DOJ "did not independently identify [the defendant]'s case." Pet'r's Mem. at 11 n.5. Instead, counsel for the defendant submitted the case for review," and in September 2015, "the United States Attorney's Office for the District of

Columbia notified [the defendant], through counsel, that the government had reviewed [his] case," and concluded that some form of false hair evidence was presented during his criminal trial. *Id.* (citing Cohen Letter at 2); *see also* Pet'r's Mem. Ex. A (Letter, dated September 11, 2015, from Norman Wong, Special Counsel, DOJ to defense counsel) at 2, 7, ECF No. 2-1. In this letter, the government confirmed that it would "not dispute that [hair evidence] should be treated as false evidence and that knowledge of the falsity should be imputed to the prosecution." Kadzik Letter at 2; *see also* Gov't's Opp'n at 20 n.15 ("[T]he government . . . will not contest that the erroneous evidence was false or misleading or that the government as a whole should have known that it was false or misleading."). After receiving this letter, and in light of the government's concession, the defendant filed the instant motion to vacate his conviction and for a new trial under 28 U.S.C. §2255, which motion is now ripe for review.

## II. LEGAL STANDARD

Under 28 U.S.C. § 2255(a), a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." *Id.; see also United States v. Farley*, 72 F.3d 158, 162 (D.C. Cir. 1995) (a federal conviction "may be set aside *only* on direct appeal or *via* a section 2255 motion" (emphasis in original) (citing Fed. R. Crim. P. 32(d)). This statute "replaced traditional habeas corpus for federal prisoners (at least in the first instance) with a process that allowed the prisoner to file a motion with the sentencing court" challenging his sentence "to make postconviction proceedings more efficient" by "direct[ing] claims not to the court that had territorial jurisdiction over the place of the petitioner's confinement but to the sentencing court, a court already familiar with the facts of the case." *Boumediene v. Bush*, 553 U.S. 723, 774–775 (2008). "If the court finds that . . . there has been such a denial or infringement of the constitutional rights of the prisoner as to

render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate."  28 U.S.C. § 2255(b).

While a judgment "cannot be lightly set aside by collateral attack, even on habeas corpus," *McNair v. United States*, 235 F.2d 856, 858–859 (D.C. Cir. 1956) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 468–69 (1938)), the Supreme Court has long held that the prosecutor's knowing use of false evidence or perjured testimony constitutes a denial of the defendant's due process right to a fair trial and may warrant reversal of the conviction.  *See, e.g., Giglio v. United States,* 405 U.S. 150, 155 (1972) (finding that "the due process requirements enunciated in *Napue*," as well as "other cases . . . require a new trial" where a key witness falsely testified at trial, without correction, about the government's promise not to prosecute him if he testified before the grand jury and at trial); *Napue v. Illinois,* 360 U.S. 264, 265–70 (1959) (holding that in murder prosecution with no reliable eyewitnesses, failure of the prosecutor to correct the false testimony of "the principal witness for the State" regarding the promise of a recommended reduced sentence in return for his testimony, denied petitioner due process of law in violation of the Fourteenth Amendment); *Mooney v. Holohan,* 294 U.S. 103, 112–113 (1935) *(per curiam)* (holding that conviction obtained "through a deliberate deception of court and jury by the presentation of testimony known to be perjured" is "inconsistent with the rudimentary demands of justice" and may constitute a violation  of the Fourteenth Amendment); *accord Perry v. New Hampshire*, 565 U.S. 228, 237 (2012) ("Only when evidence is so extremely unfair that its admission violates fundamental conceptions of justice . . . have we imposed a constraint tied to the Due Process Clause.") (internal quotations and citation omitted).  The Supreme Court has also spoken eloquently to the policy underpinnings of this constitutional rule, citing "the special

role played by the American prosecutor in the search for truth in criminal trials" and the fact that "the United States Attorney is 'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

The same constitutional value of promoting fair trials that animated the Supreme Court's decisions in *Mooney*, *Napue* and *Giglio* involving the government's knowing use of false evidence at trial also undergirds the holding in *Brady v. Maryland*, 373 U.S. 83, 87 (1963), and its progeny, "that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *See id.* (noting that the "principle of *Mooney* [] is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused," and "[s]ociety wins not only when the guilty are convicted but when criminal trials are fair"). Thus, claims that the prosecution knowingly used false evidence are a subset of *Brady* claims. *See United States v. Agurs*, 427 U.S. 97, 103 (1976) (explaining that "[t]he rule of *Brady* [] arguably applies in three quite different situations" involving "the discovery, after trial of information which had been known to the prosecution but unknown to the defense," including, with citation to *Mooney*, "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury.").

The D.C. Circuit has explained that "even if the prosecution either sponsored or failed to correct false testimony, the grant of a new trial is not automatic." *United States v. Vega*, 826

F.3d 514, 529 (D.C. Cir. 2016); *see also Strickler,* 527 U.S. at 281 (noting that "not every violation of [the prosecution's broad duty of disclosure] necessarily establishes that the outcome was unjust"); *Giglio v. United States*, 405 U.S. at 154 ("We do not, however, automatically require a new trial whenever a combing of the prosecutors' files after the trial has disclosed evidence possibly useful to the defense but not likely to have changed the verdict," because "[a] finding of materiality of the evidence is required under *Brady*") (internal quotation marks and citation omitted); *United States v. Straker*, 800 F.3d 570, 604 (D.C. Cir. 2015) (noting that "prosecutorial misbehavior alone does not a *Brady* violation make"). More must be shown to necessitate a new trial.

A due process violation arising from the government's knowing suppression of evidence only entitles a defendant to relief when "three components" are met: "[(1] The [suppressed] evidence . . . must be favorable to the accused, either because it is exculpatory, or because it is impeaching; [(2)] that evidence must have been suppressed by the [government], either willfully or inadvertently; and [(3)] prejudice must have ensued." *Strickler,* 527 U.S. at 281–82; s*ee also United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017) (enumerating "three elements" to prove *Brady* violation, with "[t]hird, the movant must demonstrate prejudice"). "To satisfy the prejudice element, the evidence must be material." *Id.*; *see also Turner v. United States*, 137 S. Ct. 1885, 1893 (2017) (noting that, for claimed *Brady* violation, petitioners "are entitled to a new trial only if they 'establis[h] the prejudice necessary to satisfy the "materiality" inquiry.'" (quoting *Strickler*, 527 U.S. at 282) (alteration in original)).

As a type of *Brady* claim, a similar analysis applies when a defendant seeks vacatur of a conviction based on the government's knowing use of false evidence at trial. *See Straker*, 800 F.3d at 604. For such *Napue/Giglio* claims, the Supreme Court has articulated the materiality

inquiry to be whether there is "any reasonable likelihood [the false testimony could] have affected the judgment of the jury." *Napue,* 360 U.S. at 271. *See also Agurs,* 427 U.S. at 103 (noting that "the Court has consistently held that a conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury") (internal citations omitted); *Giglio v. United States*, 405 U.S. at 154 ("A new trial is required if 'the false testimony could . . . in any reasonable likelihood have affected the judgment of the jury . . . .'" (quoting *Napue*, 360 U.S. at 271) (ellipses in original)); *Vega*, 826 F.3d at 529 (stating that "if the prosecution either sponsored or failed to correct false testimony . . . 'a reviewing court must determine" whether "the false testimony could in any reasonable likelihood have affected the judgment of the jury" (quoting *United States v. Burch*, 156 F.3d 1315, 1329 (D.C. Cir. 1998) (quoting *Giglio*, 405 U.S. at 154)); *Straker*, 800 F.3d at 604 (same); *United States v. Gale*, 314 F. 3d 1, 4 (D.C. Cir. 2003) (same).[10]  As the Supreme Court recently explained in commenting on

---

[10]    By contrast to the materiality test applied to *Napue/Giglio* violations requiring "any reasonable likelihood" that the false evidence could have affected the judgment of the jury, the Supreme Court has expressed a slightly different materiality test for *Brady* violations involving suppressed exculpatory and impeachment evidence. Specifically, suppressed evidence "is 'material' within the meaning of *Brady* when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different." *Turner*, 137 S. Ct. at 1893 (quoting *Cone v. Bell*, 556 U. S. 449, 469-70 (2009)).  Rather than "reasonable likelihood" or "reasonable probability," the defendant urges that the Court apply yet a third iteration of the materiality standard using the words "reasonable possibility," which the defendant characterizes as "simply another articulation of the same requirement . . . ." Def's Reply at 2.  As support for a "reasonable possibility" version of the materiality test, the defendant cites a footnote in the part of Justice Blackmun's opinion in *United States v. Bagley*, 473 U.S. 667, 679 n. 9 (1985), that failed to garner a majority and Justice Souter's concurring/dissenting opinion in *Strickler*, 527 U.S. at 299.  *See* Def's Reply at 2.  In *Bagley* the Supreme Court found error in an automatic reversal of a conviction due to a *Brady* violation without analyzing the materiality of the suppressed evidence, 473 U.S. at 678, and, in a part of the opinion joined by only one other Justice, Justice Blackmun discussed application of the materiality standard in different situations, noting that "the standard of review applicable to the knowing use of perjured testimony is equivalent to the *Chapman* harmless-error standard," *id.* at 679 n. 9 (citing *Chapman v. California*, 386 U.S. 18, 87 (1967)).  This simply does not amount to the Supreme Court's endorsement of a "reasonable possibility" standard.  Likewise, in *Strickler*, the majority of the Supreme Court expressly rejected "reasonable possibility" as the correct materiality standard for Brady violations, finding "surely correct" a district court's determination that the defendant had met a "reasonable *possibility*" standard but that "petitioner's burden is to establish a reasonable *probability* of a different result," leading to denial of the petition for failure to "show materiality under *Brady* . . . ." *Strickler*, 527 U.S. at 296 (emphasis in original).  Nevertheless, in his concurring/dissenting part of the opinion, Justice Souter stated, "We

the "any reasonable likelihood" standard, the defendant "need not show that he 'more likely than not' would have been acquitted had the new evidence been admitted," *Wearry v. Cain*, 136 S. Ct. 1002, 1006 (2016), or that "the undisclosed information may not have affected the jury's verdict," *id*. at n.6, but "only that the new evidence is sufficient to 'undermine confidence' in the verdict," *id*. (quoting *Smith v. Cain*, 565 U.S. 73, 75 (2012) (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995))). This fact-specific materiality inquiry requires evaluation of the false evidence "in the context of the entire record." *Turner*, 137 S. Ct. at 1893 (quoting *Agur*s, 427 U.S. at 112); *see also Vega*, 826 F.3d at 531 (finding false testimony to be not material after "looking at the evidence in the record as a whole"); *United States v. Baxter*, 761 F.3d 17, 23–24 (D.C. Cir. 2014) (noting that even if suppressed evidence could have been used successfully for impeachment, "the probability of a different outcome depends on the context of all of the evidence offered at trial").

The defendant bears the burden of proving that false evidence presented at trial was material. *Straker*, 800 F.3d at 604 (holding "[the defendant] failed to demonstrate that the misleading content of the [] testimony" was material); *see also Alix v. Quarterman*, 309 F. App'x 875, 879 (5th Cir. 2009) ("[The defendant]'s assertion that the burden of proof rests with the prosecution to disprove his *Napue* allegations is contrary to clear precedent."). [11] This is

have treated 'reasonable likelihood' as synonymous with 'reasonable possibility' and thus have equated materiality in the perjured-testimony cases with a showing that suppression of the evidence was not harmless beyond a reasonable doubt." *Id.* at 29. He expressed the view that the difference between reasonable "possibility," "likelihood" or "probability" "are slight" but nonetheless "express distinct levels of confidence concerning the hypothetical effects of errors on decisionmakers' reasoning . . . ." *Id*. The majority in *Strickler*, however, stuck to the "reasonable probability" standard in evaluating and rejecting the defendant's *Brady* claim. *Id.* at 296 (holding that "petitioner has not shown that there is a reasonable probability that his conviction or sentence would have been different had these materials been disclosed [and] therefore cannot show materiality under *Brady* or prejudice from his failure to raise the claim earlier."). This Court is not persuaded that employing a different word, "possibility," makes the materiality standard any clearer in application than the standard formulation used in binding caselaw involving *Napue/Giglio* claims.

[11]      The defendant suggests that for *Napue/Giglio* claims, "it makes no difference where the burden of persuasion lies" or, alternately, that the burden should be on the government, in accordance with "the original

consistent with the burden of proof generally applicable to a petitioner's § 2255 claim to establish a denial of constitutional rights. *See, e.g.*, *McNair v. United States*, 235 F.2d at 858; *United States v. Simpson,* 475 F.2d 934, 935 (D.C. Cir. 1973) (concluding that, in § 2255 action to set aside plea of guilty, "the preponderance of evidence supports the judgment rejecting petitioner's claim"); *Grennett v. United States*, 403 F.2d 928, 930–931 (D.C. Cir. 1968) (finding that petitioner in § 2255 action "has failed to prove by a preponderance of the evidence, as he is obliged to do in a collateral proceeding," that his conviction should be set aside).

## III.    DISCUSSION

The defendant argues that he was "deprived of his constitutional right to a fair trial" because "a critical piece of the government's evidence against him," in the form of Agent Scholberg's hair testimony, was "false and misleading" and "knowingly presented by the government."  Pet'r's Mot. at 1; Pet'r's Mem. at 44.  He further argues that the hair testimony "carried the weight of science" and provided "powerful scientific support to bolster" Hill and Robinson's otherwise "deeply flawed" testimony, Pet'r's Mem. at 37, 41, and thus, without the hair evidence, the case against him was "equivocal at best," *id.* at 42.

The government concedes that Agent Scholberg's hair testimony was "false or misleading" and that it knew or should have known this at the time of trial, *see supra* Part I.C; *see also* Gov't's Opp'n at 20 n.15, but, in opposition, argues that the defendant is nonetheless not entitled to relief because the prosecution's "evidence in this case was compelling" even without the hair testimony, Gov't's Opp'n at 23.  Despite the challenges to the credibility of Hill and

---

common law harmless-error rule [which] puts the burden on the beneficiary of the error either to prove that there was no injury or to suffer a reversal of his erroneously obtained judgment."  Pet'r's Reply at 3 and n.2 (quoting *Chapman v. California*, 386 U.S. at 24).  This suggestion simply ignores established law applied to *Napue/Giglio* claims, as cited in the text, and, further, as the government correctly points out, "[a]lthough the Supreme Court in *Bagley* stated that 'the standard of review applicable to the knowing use of perjured testimony is *equivalent* to the *Chapman* harmless-error standard,' the Court did not discuss—and, accordingly, did not intend to modify—the allocation of the burden of proof in *Napue* cases."  Gov't's Surreply at 2 n.2 (emphasis in original).

Robinson, in the government's view, the "testimony provided by other witnesses" at trial and "evidence found at the scene of the crime . . . corroborated Hill and Robinson's accounts of what the defendant had told them" and "provided additional evidence of the defendant's guilt," such that the hair evidence did not have a meaningful impact on the case, regardless of how inculpatory it was. Gov't's Opp'n at 26–27.

Given the government's concession that it knowingly used false evidence at trial, the only dispute between the parties is whether there is "any reasonable likelihood" that the hair testimony could have had an impact on the outcome of the defendant's trial. *See* Pet'r's Mem. at 12; Gov't's Opp'n at 20 n.15. The defendant raises three main points to support his materiality argument, but none is persuasive.

First, the defendant argues that because "Agent Scholberg's testimony carried with it the weight of science," a "reasonable juror could think that the testimony offered by the then-seven-year FBI veteran, qualified as an expert in his field, was scientifically founded and could be relied upon as conclusive evidence." Pet'r's Mem. at 38–39. The defendant notes that "'there is often an inherent danger with expert testimony unduly biasing the jury because of its aura of special reliability and trust,'" *id*. at 38 (quoting *United States v. Anderson*, 851 F.2d 384, 393 (D.C. Cir. 1988) (internal quotation omitted)), and that as a result of this special reliability, lay jurors may assign "talismanic significance" to expert testimony, *id*. (quoting *United States v. Frazier*, 387 F.3d 1244, 1263 (11th Cir. 2004)). According to the defendant, the importance of the hair evidence to the government's case is demonstrated by the prosecutor's reliance on Agent Scholberg's hair analysis testimony in summations. *Id*. at 44.

This argument has appeal. To be sure, scientific expert testimony may be viewed by a jury as more credible, reliable, and impartial than other forms of evidence and therefore can be

"both powerful and quite misleading." *Miller v. Bill Harbert Int'l Constr., Inc.*, 608 F.3d 871, 895 (D.C. Cir. 2010) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 (1993)); *see also Ake v. Oklahoma*, 470 U.S. 68, 81 n.7 (1985) (noting that testimony from an expert may be assigned more weight than identical testimony from a lay person); *United States v. Williams*, 827 F.3d 1134, 1161 (D.C. Cir. 2016) (holding that a witness improperly testified as both an expert and lay witness, given the risk that the "aura of special reliability and trustworthiness surrounding expert testimony" would be imputed to the lay testimony); *United States v. Pires*, 642 F.3d 1, 12 (1st Cir. 2011) ("[B]ecause of an expert's stature *qua* expert, jurors may assign more weight to expert testimony than it deserves."); *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000) ("[T]he district court functions as a 'gatekeeper' whose role is to keep experts within their proper scope, lest apparently scientific testimony carry more weight with the jury than it deserves."); *United States v. Stagliano,* 729 F. Supp. 2d 222, 228–29 (D.D.C. 2010) (noting "the tendency of lay jurors to place special weight on scientific expert testimony"). Yet, the hair evidence in this case was simply not as demonstrably important to the government's case as the defendant would suggest.

Contrary to the defendant's characterization of the summations, for example, the prosecutor spent relatively less time on the hair evidence than other more critical evidence, such as the defendant's confession to Hill and Robinson, the testimony about the day of the murder, and the finding and location of the victim's key ring. The defendant is correct that the hair evidence was used to bolster the credibility of Hill and Robinson, but served as only one piece among multiple other pieces of evidence to show the veracity of their testimony about the defendant's confession. In fact, the prosecutor discouraged any complete reliance on the hair evidence, expressly stating instead that the jury was not being asked to rely on the hair evidence

alone but to consider this evidence along with other corroborating testimony and physical evidence presented.

While Agent Scholberg testified that the unknown hairs and the defendant's hairs were "microscopically the same or alike," Trial Tr. 7/13/71 at 530, he repeatedly "undercut the significance of his own testimony," Gov't's Opp'n at 28. He admitted that he was only testifying that the unknown hairs "could have" come from the defendant, and further emphasized that hairs generally "do not contain enough identifying characteristics to be positively identified as originating from a certain head of a certain individual to the exclusion of all other individuals in this race group." Trial Tr. 7/13/71 at 530. Further, as defense counsel himself clarified on cross-examination, Agent Scholberg's only testimony that could be interpreted to carry statistical weight was that, in four or five of the roughly 10,000 analyses he had performed, he was unable to distinguish between the hair of the *victim* and the hair of the *defendant*. *Id.* at 531–32. Given that the physical differences between the defendant and the victim, this comparison is unilluminating.

Agent Scholberg did not testify as to the chance of a false match between the hair of any two randomly-chosen individuals but, at the same time, explicitly eschewed assigning any statistical estimate to the number of individuals in the community who could have produced a hair that matched the defendant's hair, stating that he "ha[d] no idea whether anyone would have the same microscopic characteristics" as the defendant and that he "d[id]n't have a basis" to "give a number to it." *Id.* at 536. Indeed, the inclusion of such a statistical estimate in his testimony would have been speculative and therefore misleading to the jury. Moreover, even if the hair evidence were stronger, the defendant's focus on it, Pet'r's Mem. at 4–12, 37–44, misses the mark. The defendant's *Napue*/*Giglio* claim does not rise or fall on the strength of the false

evidence, but on the strength of the other evidence presented at trial without the false evidence. No matter how strong the false evidence, if there is no reasonable likelihood of the jury reaching a different outcome only considering the other evidence presented at trial, the false evidence is not material. *Vega*, 826 F.3d at 530–31.

Second, the defendant argues that even if the hair matching evidence were not sufficient to support a conviction, this evidence was nonetheless necessary to obtain the conviction because it provided the only reliable corroboration for the otherwise "deeply flawed" testimonies of Hill and Robinson, whose testimonies were central to the trial. Pet'r's Mem at 38–39; Pet'r's Reply at 9–11. The defendant is correct that the testimony of Hill and Robinson was the linchpin of the government's case, but he fails to acknowledge that, absent the hair evidence, the testimony of these two witnesses remained supported by "overwhelming extrinsic corroboration." *Butler*, 481 F.2d at 535. A brief summary of the other evidence bolstering the testimony of Hill and Robinson about the defendant's confession bears this out. Hill, both in his statement to the police and in his testimony at trial, stated that the defendant told him that the victim had caught the defendant selling drugs in a vacant apartment, Trial Tr. 7/8/71 at 66–67; that the defendant had "tied the old man up" after a struggle and "put a stocking or something in his mouth," *id.*; that the defendant began to choke the victim with a belt, but that the belt broke and so the defendant "started choking him with a telephone cord," *id.* at 67–68; and that after the defendant strangled the victim, he "poured some water down [the victim's] throat to make sure he was dead," *id.*; after which the defendant took the victim's keys, *id.* at 68. Robinson's testimony was that the defendant, in a more limited conversation, had told her that because the victim caught him selling drugs, he had choked the victim with a belt until it broke, after which he choked the victim with a telephone cord. Trial Tr. 7/9/71 at 236–38. All of this testimony was fully

consistent with evidence uncovered at the crime scene. Moreover, even if, as the defendant

suggests, a third party had observed and then described the crime scene to Hill and Robinson in

the short time between the discovery of the victim and Hill and Robinson's statements to the

police, the defendant offers no logical explanation for how that person could have known from

observing the crime scene that the broken belt was torn instead of cut, that the contents of the

victim's mouth were wet with water and not saliva or another substance, or that the victim's keys

were missing.[12]

On direct review, the D.C. Circuit considered the array of evidence presented in the case,

and found it to be "substantial" and "overwhelming extrinsic corroboration" of Hill and

Robinson's testimony. *Butler*, 481 F.2d 531 at 532–33. The defendant urges the Court to

decline to follow the Circuit's opinion because "it relied on the hair match testimony to find

harmlessness," Pet'r's Mem. at 43, but he fails to acknowledge the limited weight the Circuit

assigned to the hair evidence in relation to the other evidence at trial, *see supra* Part I.A.8. The

Circuit mentioned the hair evidence once, in passing, but discussed in detail other evidence

corroborating Hill and Robinson's testimony. Additionally, the Circuit acknowledged Hill and

Robinson's credibility issues, but noted that the defense's broad-based attack at trial regarding

Hill and Robinson's drug use, inconsistent statements and misstatements to hide that drug use,

had put the jury "on notice that, to the extent the witnesses' testimony was uncorroborated, it

should be weighed with caution." *Butler*, 481 F.2d at 535.

Finally, the defendant argues that without the hair evidence bolstering Hill and

---

[12]     The defendant's assertion that the police, "who knew the details of the crime scene and spoke extensively with Hill and Robinson in unrecorded interviews," Pet'r's Reply at 8, may have told Hill and Robinson the details of the crime scene amounts to speculation that was presented by the defense at trial and rejected by the jury, *see* Pet'r's Mem. at 25 (citing Trial Tr. 7/13/71 at 507 (cross-examination of Officer Fickling, who testified that he had told Robinson that her testimony was inconsistent with Hill's but that he did not provide any details of Hill's testimony)), and still lacks any concrete support.

Robinson's credibility, the remaining evidence in the case was "equivocal at best." Pet'r's Mem. at 42–44. He discounts the paint on the defendant's clothes as "innocent[ly] explain[ed]" by his visit to the apartment three days before the murder. *Id.* at 42. He further argues that anyone could have thrown the victim's keys on the roof of buildings near the defendant's girlfriend's home, which was frequented by the defendant, including on the day of the murder, *id.*; that the testimony placing him and the defendant together near the scene of the crime at the relevant time did not suggest any ill-will between the defendant and the victim, *id.*; that no evidence was presented about two boys leaving the building after the defendant was allegedly caught selling them illegal drugs, *id.*; and that of the "sixteen fingerprints located at the scene of the murder, none belonged to [the defendant]," *id.* at 4, 42.

The defendant's marshalling of the evidence in the most favorable light to his position is masterful but nonetheless falls short. Even if an innocent explanation is plausible for these individual pieces of evidence viewed in isolation, the defendant fails to appreciate their collective weight. As already discussed, the "comprehensive" testimony of Hill and Robinson, — both of whom considered the defendant their friend and may have been viewed by the defendant as having an incentive to keep secret his confession to avoid disclosure of their own illegal drug use — was "overwhelming[ly]" supported by "extrinsic corroboration." *Butler*, 481 F.2d at 535. The lack of any identifiable fingerprints of the defendant is not inconsistent with Hill and Robinson's testimony, nor is the fact that no witness saw two boys fleeing from the apartment after the murder. Hill and Robinson's testimony about the defendant's confession was corroborated not only by the consistency in their rendition of events, including self-incriminatory admissions of illegal heroin use, but also by crime scene details they otherwise would not know. The defendant's confession was further corroborated by unchallenged forensic evidence that the

same color paint found on the victim and on the defendant's clothing, as well as a bottle found at the scene of the crime, could have come from the same source, and by the fact that the victim's keys, which Hill testified the defendant admitted he took, were found on a roof a few houses from where the defendant often stayed.  In addition to the significant corroboration for the details of the crime alleged by Hill and Robinson, multiple witnesses saw the defendant in the vicinity of the apartment on the day of the murder, and though one witness saw the defendant and the victim working on a car together before the murder occurred, no witness clearly identified the defendant's location between two and three o'clock, the time that the murder likely occurred. Finally, the defendant clearly had access to the apartment, as he knew people who lived in the building, and had been in the building previously and knew that the apartment where the victim's body was found was vacant as he had been there a few days prior.  While this evidence may be equivocal in isolation, when viewed as a whole, and even without the hair testimony, it established the defendant's guilt beyond a reasonable doubt.

## IV.    CONCLUSION

Forty five years ago, Dennis Butler was convicted and sentenced to life imprisonment for committing the brutal murder of Jesse Mears, following a jury trial at which the government, as it has recently admitted, presented false hair matching evidence that it knew or should have known was false at the time of trial.  While the government's use of this false evidence should not have occurred, upon review of the entirety of the trial record, the Court concludes that "there is no reasonable likelihood" that presentation of the false hair matching evidence "could have altered the outcome of the case."  *Vega*, 826 F.3d at 531.  Accordingly, the defendant is not entitled to relief and his motion for a new trial, under 28 U.S.C. § 2255, is denied.

An appropriate Order accompanies this Memorandum Opinion.

**Date**: August 16, 2017

_____
BERYL A. HOWELL
Chief Judge